MILLEDGE, STANLEY, Associate Judge.
This case deals with the duty of a subcontractor to credit undesignated payments received from a general contractor to the particular debt owed by the debtor when the ultimate source of the payment is the owner of land having a general contractor for the erection of improvements, since the owner; by virtue of the mechanic’s lien law, is a statutory surety on the contractor’s debt to the sub-contractor on the same job.
The appellants, the Barnetts, contracted with Snyder Enterprises, Inc., on October 2, 1957, to build a swimming pool at their home for $3,673.75. Snyder, shortly afterward, entered into a sub-contract with Concrete Placing Co. to do a part of the work for $1,856 plus an incidental cost determinable only after the work was finished. This was not an isolated transaction between Snyder and Concrete. Concrete had one general ledger account with Snyder in which they debited Snyder with each sub-contract (including the present one) showing the location of each job. By an initial payment of $1,000 at date of the general contract and by subsequent payments on October 16 and October 31, 1957, Barnett paid Snyder a further sum of $1,-973.55 and on October 31 Concrete credited Snyder with $856, making a total then received from Snyder during October of $1,856, the amount of the sub-contract. Concrete did not place either payment to *630 the Barnett job but simply entered a gen-'' eral credit to the account of Snyder.
Before the Barnett job started Snyder’s, shaky financial condition was . known to Concrete. ' As a matter of fact, Snyder-soon took bankruptcy. In September, 1957, Snyder had a meeting with some of its creditors including Concrete to whom Snyder owed several thousand dollars on old jobs. As to what transpired at the meeting there is conflict in the evidence. According to Snyder, Concrete put his company on a “pay as you go basis,” that is, as jobs were commenced and completed they would be paid for before another job was commenced. Concrete’s testifying officer said' that the billing arrangement was not changed but that Snyder was “to pay on their old account an amount equal to or greater each month 'than the amount of work that we did in any month. In other-words, they were not getting further behind and were to catch up as they went along.” Payments by Snyder were to be. applied “to the oldest due account.” According to this, old accounts were' to be credited with money received by Snyder on new accounts instead of applying them on the new sub-contract accounts, leaving concrete free to file lien claims against any unwary owners ignorant of the peculiarities of the Mechanic’s Lien Law and so, in the eyes of the lien law, foolish' enough to trust the general contractor. A few jobs, like the Barnett’s, would remove the deficit of the entire Snyder account, merely by Snyder paying the amount of each sub-contract with the owner’s money and then proceeding against the owner for the same account: After three or four owners were forced to pay double, the accounts of Snyder and Concrete- would balance. During the time the Barnett job was in progress there were no other jobs between Concrete and Snyder and- during the month of October Concrete got no money from Snyder except on -the Barnett job and with Barnett’s money. Presumably the supply of “Barnetts” was not sufficient to save-Snyder from' bankruptcy or perhaps the clever arrangement of the creditors’ conference was not put in operation soon-enough. Where could Snyder get the money to pay Concrete for new jobs not. to say the “catching up,” as it was euphemistically called, except from new owners? The question is purely rhetorical.
As already noted, Barnett paid Snyder the full amount of the general contract. In fact he paid Snyder $1,000 when this contract was executed, and the circumstance that this act of faith was done before the sub-.contract was made (or at least the record requires this assumption) was. to prove unfortunate for him, as will shortly be noticed. Snyder gave Barnett a release of lien but he did not give a sworn statement that all claims for labor and. material had been paid. Barnett did not require a bond or hold back final payment until possible lien claims had been disposed of. . So even though Concrete filed no cautionary notice it is in a fine position so far as the terms of the mechanic’s lien law is concerned.
Concrete filed its claim of lien and then, brought suit to foreclose. The owners answered that they had paid. A final decree for the entire amount of the sub-contract, with all costs, was entered for the subcontractor and against the owners. From, this decree the owners appealed.
Were the question an open one it would', seem that on equitable principles, the surety has a right to have a payment from a-principal to his creditor with funds derived from the surety (who is also debtor to the principal in the same transaction) credited to the debt affecting the surety and' that this right should not depend on the circumstances as the creditor knew or-should have known them, but simply on the respective positions of the parties. This. is the conclusion reached in the following cases: Sioux City Foundry & Mfg. Co. v. Merten, 174 Iowa 332, 156 N.W. 367, L.R. A.1916D, 1247; Townsend v. Caple, 193 Ark. 297, 99 S.W.2d 258 (even when contractor directed payment to the prejudice- *631 of the surety); Lee v. Storz Brewing Co., 75 Neb. 212, 106 N.W. 220; Merchants’ Ins. Co. v. Herber, 68 Minn. 420, 71 N.W. 624; Williams v. Willingham-Tift Lumber Co., 5 Ga.App. 533, 63 S.E. 584, 585. The case last cited said that “what is here held is not in conflict with the general rule of law that a creditor has the right, in the absence of directions by the debtor to apply a payment on account to the oldest open item on the account. This is the rule as between the creditor and the debtor. But, where the rights of third persons are involved, the law will make the credit according to principles of justice and equity. It will not permit the money of one man to be used in the payment of the debt of another man, or declare a lien on the property of the man who has paid in full for all the materials furnished to improve his property, and thus relieve from a lien the property of the man who still owes for the material that was used to improve his property. Under the facts the plaintiff had lost the right to a lien on the property of the defendants, * * * and a verdict to the contrary should not have been directed.” Under the above group of cases knowledge or notice of the sub-contractor, materialman or laborer, is not important. The equitable right of the surety, who furnished the money, does not depend on what the sub-contractor knows or should know. No positions are changed; no right relinquished or remedy foregone or even postponed when the equities are adjusted when the true source of payment is discovered. The size of the principal debt remains the same after adjustment. The difference is that the surety is exonerated and the creditor must look to his debtor instead of collecting a second time from the surety.
There are cases which hold exactly the opposite, i. e., that the existence of a surety makes no difference and the transaction is treated as if he did not exist. The creditor, whoever he is, may apply payment to whatever debt he chooses unless the debtor has directed application. By refusing to distinguish between totally different situations such cases have no persuasiveness, and as we are not bound by them no further reference to them is necessary.
A third group of cases make the matter turn on whether the creditor at the time of payment knows or the facts put him on notice, that the undirected payment has its origin in the surety. In all of these cases, so far as we are aware, when the surety was given relief, there was already in existence a debt on which the source of the payment was the surety. Typical of these cases is Farnsworth & Co, v. Electrical Supply Co., 5 Cir., 1940, 112 F.2d 150, 130 A.L.R. 192; Id., 5 Cir., 113 F.2d 111, 130 A.L.R. 197, to which is appended an annotation on the subject. Standard Acc. Ins. Co. v. Duval Lumber Co., 99 Fla. 525, 126 So. 643, is in this group, of cases. This rests.on the idea that the court is not so much concerned with the position of the surety as with the “duty” of the creditor. The duty is that when a creditor receives payment from his principal derived from a surety, the creditor is under a duty to apply the payment to the particular debt on which the source of payment is surety rather than any other debt of the principal according to the creditor’s choice, as would be the case if á third party surety were not adversely affected. This duty cannot attach if there is not, ¿t time of payment, .a debt on which the source'of payment is the surety. In the Standard case, supra, the court held that a plea, because it failed to allege the existence of a debt, to which, had it existed, the payment should be applied was fatally defective. This did not repudiate but rather recognized the rule applied in Fulghum v. State, 94 Fla. 274, 114 So. 367 (where counsel for the successful appellant is the chancellor in the present case),, “all moneys paid by an owner to. a contractor under a construction contract and paid by the contractor to a mate-rialman to whom he is indebted for material and supplies furnished for such construction under such contract are, when the source from which the contractor has derived such money is known to the material- *632 man, subject to an equity which requires the payment to be applied to the extent of the indebtedness for such materials upon the payment of the contractor’s obligations for the materials and supplies furnished by the materialman for that particular construction.” [99 Fla. 525, 126 So. 645.]
While there is no difficulty in charging the sub-contractor with knowledge, the evidence is not clear that on October 3, 1957, when Snyder paid Concrete $1,000, there was then in existence a debt on the Barnett job. We must, under the doctrine of stare decisis, apply the holding in the Standard case, supra, and hold that Barnett may not have credit for this payment.
A different situation exists as to the $856 paid by Snyder to Concrete on October 25, 1957, and $88.85 (for the incidental expenses) a few days later. Concrete had finished its sub-contract on the Barnett pool by that time. There was then a debt from Snyder to Concrete, originally of $1,856 plus incidentals, with a present balance of $856 plus incidentals on which Barnett was statutory surety. It would be hard to state a case in which the circumstances are stronger than here from which knowledge of the creditor can be inferred. The particular size of the payment, knowledge of the precarious financial condition of Snyder precluding any likely source of payment except new jobs, and the circumstance that Barnett’s was the only new job, all impute knowledge.
We should continue our examination one more step. In the Fulghum case, supra, the materialman admittedly had knowledge so the holding is no broader than the facts. We are not aware of any Florida case which holds, one way or the other, on the same facts as in Fulghum except that instead of knowledge, the sub-contractor is on notice of facts which put him on inquiry as to the source of the payment, which inquiry, if made, would reveal the surety as the source. Cases holding that notice has the same consequence as knowledge are Hughes & Co. v. Flint, 61 Wash. 460, 112 P. 633; Bay Lumber Co. v. Pickering, 120 Cal.App. 163, 7 P.2d 371; Columbia Digger Co. v. Sparks, 9 Cir., 1915, 227 F. 780; Hortman-Salmen Co. v. Naquin, 1930, 12 La.App. 491, 126 So. 453. It does not seem that a valid distinction can be made by which a sub-contractor is held to a duty to the surety if he has knowledge but no duty if he has notice. The difference seems to be merely a method of proof. If it is circumstantial it can be called notice. It spells knowledge either way.
To sum up, the decree for the sub-contractor must be treated as correct for declining to give Barnett credit for the $1,-000 payment; (2) the owner, Barnett, should have credit for the $856 payment as the creditor is charged by the circumstances with knowledge that this payment was in reality made by Barnett, and the same holds true as to the $88.85 paid by Snyder to Concrete for the incidental costs as this was the last item paid on the Barnett job. In short, Concrete holds a lien on the Barnett land only for the $1,000 with interest.
Accordingly, the decree appealed from is affirmed in part and reversed in part, and the cause is remanded to modify the decree to give the appellants the credits as indicated.
Affirmed in part and reversed in part.
HORTON, C. J., and CARROLL, CHAS., J., concur.